Megan E. Glor, OSB No. 930178
Email: megan@meganglor.com
John C. Shaw, OSB No. 065086
Email: john@meganglor.com
Megan E. Glor, Attorneys at Law, PC
707 NE Knott Street, Suite 101
Portland, OR  97212
Telephone: (503) 223-7400
Facsimile:  (503) 751-2071

Attorneys for Plaintiff Jane A. Medefesser

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| JANE A. MEDEFESSER,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>　　　　　Defendant. | Case No.  6:18-cv-00041-MK<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S OBJECTIONS TO FINDINGS AND RECOMMENDATION** |

## I.   INTRODUCTION

Plaintiff Jane Medefesser left her position as a software engineer in March 2014 due to, *inter alia*, chronic pain, chronic fatigue, cognitive problems and migraine headaches.  She filed a disability claim through her group coverage, insured by FDefendant MetLife.  MetLife approved Plaintiff's claim for three years under its policy's "own occupation" disability standard, but then

terminated her claim under the policy's "any occupation" standard – even though her treating physician of more than 10 years, Dr. George Supplitt, and MetLife file review consultant, Dr. Tracey Schmidt, had confirmed she was disabled from **all occupations** during this initial "own occupation" period.  Plaintiff's claim was also supported by a cardiopulmonary exercise test ("CPET"). MetLife's own consultant did not dispute the CPET is the gold standard for measuring and evaluating functional capacity and fatigue.

Plaintiff's condition deteriorated after she left work.  Over time, she was also diagnosed with fibromyalgia, carpal tunnel syndrome, medial epicondylitis, Sicca syndrome, Sjogren's syndrome, musculoskeletal problems apart from general fibromyalgia pain and irritable bowel syndrome ("IBS").  She began treating with a rheumatologist, Dr. Theresa Karplus, and was prescribed powerful pain medications, steroids and arthritis medicines.  Despite conclusive evidence of a continuing disability that precluded all work, MetLife terminated Plaintiff's claim in March 2017.  MetLife did so primarily based upon the report of an in-person examination it commissioned in the Fall of 2016, by Dr. Maria Armstrong-Murphy.  Dr. Armstrong-Murphy documented Plaintiff's ongoing severe symptoms and long list of diagnoses, but implausibly concluded Plaintiff was not disabled.  MetLife also commissioned file reviews that made many of the same errors and omissions.

Judge Kasubhai accurately analyzed the record and explained the errors in MetLife's analysis and why its decision cannot stand. He explained why the conclusions and observations of Plaintiff's treating providers, which are consistent with and supported by the CPET, neurocognitive testing, the analysis of MetLife's Dr. Schmidt and the observations of MetLife's

Dr. Armstrong-Murphy, are accurate. Accordingly, this Court should adopt Judge Kasubhai's Findings and Recommendation.

## II. DISCUSSION

### A. Plaintiff was disabled from all occupations when MetLife terminated her claim in March 2017.

When Plaintiff left work in March 2014 (AR 406), she had been suffering from multiple chronic, painful conditions that required sedating medications and caused fatigue: diffuse joint pain, cervicalgia, rotator cuff syndrome, bursitis, hypersomnia with sleep apnea, lumbar sprain/strain and pain (AR 332, 354), cognitive problems (AR 331), fibromyalgia with widespread pain (AR 1644, 1652-53), frequent migraines (AR 1641), carpal tunnel syndrome and medial epicondylitis (AR 1659-60), joint calcification (AR 339), wrist/hand pain (AR 339, 360) and Sicca syndrome. AR 360 (3/20/13). *See* Plaintiff's Motion for Judgment (Doc. # 20), pp. 4-5.

Plaintiff's pain had worsened, requiring increasing doses of pain medications. *See Id*., pp. 5 (citing AR 358-59 (2/13), 350-51 (5/13), 343-44 (7/13), 352-53 (10/13), 362-63 (11/13)). She reported that she was no longer able to work due to brain fog, focus and communication problems and chronic pain. *Id*., p. 5 (citing AR 412-414). MetLife interviewed her and documented her desire to avoid a prolonged disability and return to work: "EE does not want to retire or financially wants to rtw..." *Id*., p. 6 (quoting AR 413).

In April 2014, Plaintiff's treating primary physician, Dr. Supplitt (AR 305-9), documented "widespread pain which makes it hard for her to sustain even sitting for more than

one or 2 hours" and "increasing cognitive difficulties over the last 6 months." *Id*. (quoting AR 308-9, AR 299).

In 2014, treating psychologist Dr. Ruth Leibowitz documented fatigue, pain and cognitive dysfunction and stated, "I cannot imagine her being successful in a full-time capacity at present*." Id*., p. 8 (quoting AR 187).  In July 2014, examining neuropsychologist Dr. Joan Pugh found cognitive problems and explained that pain and fatigue from fibromyalgia might be contributing to Plaintiff's impairment. *Id*., p. 6, n. 4 (citing AR 1684, 1685).  In November 2014, neurologist Dr. Michelle Moon diagnosed chronic migraines and rebound headaches. *Id*., p. 8 (citing AR 348-9).  In December 2014, rheumatologist Dr. Karplus treated shoulder and wrist pain (*id*., p. 8, citing AR 1565) and in February 2015, prescribed prednisone for Plaintiff's chronic joint pain.  AR 1578.  In March 2015, she noted the joint pain had "promptly returned after discontinuing prednisone." *Id*., p. 9 (quoting AR 1581).

In April 2015, Dr. Supplitt evaluated "musculoskeletal problems apart from [Plaintiff's] general fibromyalgia pain" (AR 1530), including right knee pain/popping, right shoulder, upper back, wrist and forearm pain, tension headaches and migraines. *Id*. (citing AR 1530-31). Plaintiff had difficulty lifting her right arm, carrying objects, keyboarding and climbing stairs.  *Id*. (citing AR 1531).  Dr. Karplus recommended "methotrexate for her Sjogren's related arthritis." AR 1591.  In May 2015, Plaintiff reported "significant ongoing diarrhea (to the point that she sometimes cannot leave the house)" (AR 1595) and Dr. Karplus diagnosed IBS. *Id*. (citing AR 1601).  In June 2015, Dr. Supplitt opined on forms provided by MetLife that Plaintiff was "permanently disabled."  AR 40.  *See* Pl. Mot., pp. 10-11 (addressing AR 37-41).

In November 2015, even with prednisone, Plaintiff's pain level would rise to "5-6/10" when it was cold and to "6-7/10" on bad days, and she took hydrocodone for sleep. *Id.*, p. 10 (quoting AR 1279). Dr. Supplitt confirmed she was disabled, due to "fibromyalgia, Sjogren's disease, chronic low back pain, chronic neck and upper back pain, and chronic knee pain" and noted that a September 2015 CPET confirmed she "currently does not have the physical capacity to do sedentary work." *Id.*, p. 12 (quoting AR 1262). *See* Pl. Mot., pp. 13-14 (addressing the CPET).

Dr. Supplitt again indicated that he anticipated a permanent disability in November 2015. He noted treatment as "palliative with no expectation for spontaneous improvement or curative treatment." *Id.*, p. 13 (quoting AR 1262-63). He noted the CPET results were below "the ventilatory/anaerobic threshold...required for sedentary work" (AR 1262) and confirmed Plaintiff could not perform "employment of even a sedentary/stationary nature." *Id.*, p. 14 (quoting AR 1252). He stated: *"I consider her to be medically fixed and stable at the level of complete disability."* AR 1263 (emphasis added).

In February 2016, Metlife file review consultant Dr. Schmidt also endorsed the CPET's conclusions, noting that this test has "**objective measures** that can clearly distinguish between indolence and true disability" and that Plaintiff's results were consistent with the "subjective complaints and objective findings on exam." *Id.*, p. 15 (quoting AR 1206-07). Dr. Schmidt analyzed the longitudinal record. *See* Pl. Response & Reply (Doc. # 28), pp. 5-6. She concluded Plaintiff was disabled from all occupations. AR 1204.

Plaintiff continued to suffer fatigue and chronic pain in 2016. Pl. Mot., p. 16 (citing AR 793, 801, 806). In September 2016, MetLife commissioned an examination, performed by

physiatrist Dr. Armstrong-Murphy. AR 999-1007. She documented Plaintiff's diffuse pain, fatigue, limited range of motion, and balance problems. Pl. Mot., p. 17 (citing AR 999-1000, 1002). On examination, Dr. Armstrong-Murphy documented pain, weakness, swelling and reduced range of motion. *Id*. (bullet point list with record citations). She diagnosed a host of mostly-chronic conditions known to cause pain and fatigue. *Id*., p. 18. Dr. Armstrong-Murphy explained that if the pain medications were discontinued, Plaintiff "would have improved cognition but worsened symptoms and fatigability which would make it difficult for her to work." *Id*. (quoting AR 1006). In October 2016, Dr. Karplus documented the medication problem identified by Dr. Armstrong-Murphy. Plaintiff's "...diffuse joint pain" had been "slightly **worse** since she completely stopped prednisone 4 months ago." AR 802 (emphasis added); *see Id*., p. 16. Plaintiff also reported "**increased** fatigue recently and has been taking more naps through the day." *Id*. (emphasis added).

Plaintiff's symptoms continued to worsen through the close of the record in 2017. Dr. Supplitt noted her increased and widespread pain. *Id*., p. 20 (citing AR 811). Decreasing methotrexate (10/2016) due to elevated liver enzymes (AR 826-27) had resulted in more joint pain. *Id*. (citing AR 811).[1] *See also Id*., pp. 20-21 (addressing increase in pain/symptoms with medication reduction in 2017). Plaintiff had "multiple chronic pain generators." *Id.,* p. 20 (quoting AR 816).

In May 2017, neuropsychologist Dr. Glenn Goodwin evaluated Plaintiff. AR 849-66. He found a "clear pattern of neurocognitive dysfunction in aspects of attention and concentration

---

[1] In addition to sedation and cognitive problems from medications, toxicity was also a problem. *See e.g.* AR 797 (5/16), 1121 (3/16), 1129 (6/16), 827 (4/17).

**PLAINTIFF'S RESPONSE TO DEFENDANT'S OBJECTIONS TO FINDINGS AND RECOMMENDATION - Page 6 of 15**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

and in some areas of processing speed," which, he concluded based upon evidence of Plaintiff's premorbid abilities, "should be considered a clear decline from her prior level of functioning." *Id.*, pp.18-19 (quoting AR 865). Plaintiff had not taken her pain medication prior to the testing. AR 837. Dr. Goodwin observed the impact of pain on function, noting: "Perhaps of greater clinical interest" than the test results was Plaintiff's "progressive susceptibility to fatigue in the context of both testing sessions." AR 865. He observed that while fatigue is "difficult to measure, from a qualitative standpoint, this may well be the most disabling aspect in terms of understanding her neuropsychological status." *Id.*

Dr. Goodwin described Plaintiff as a "trooper," who was not likely to exaggerate (*id.*) and noted the testing had "produced a valid study with respect to effort and motivation to perform at an optimal level." AR 864-65. *See* Pl. Mot., pp 18-20 (addressing Dr. Goodwin's findings). Dr. Supplitt later documented that stopping Lyrica for the testing had "felt like...white hot pain shooting across the top of [Plaintiff's] back," with "overwhelming diffuse achiness" and increased "low back pain, left shoulder pain and right knee pain" and that Plaintiff's sleep had been reduced to 4-5 hours per night. *Id.*, p. 21 (quoting AR 837). The pain had decreased significantly once she resumed Lyrica. *Id.* (citing AR 842). *See* Pl. Mot., pp. 18-20, 21.

In mid-June 2017, Dr. Supplitt again told Metlife that Plaintiff was totally and permanently disabled from all occupations:

> I think it is safe to say that the ADD, fibromyalgia and additional
> musculo-skeletal issues make her **disabled permanently for any type of work**
> let alone for her previous high demand occupation...

*Id*, p. 21 (quoting AR 847 (emphasis added)). Dr. Supplit's opinion, based upon watching his patient's long-term struggles with pain and disability, was consistent with the conclusions of the

CPET, two neuropsychological examinations, Dr. Karplus' observations, MetLife's Dr. Armstrong-Murphy's clinical observations and MetLife's Dr. Schmidt's opinion.

Plaintiff's treating physicians, neuropsychologist Dr. Goodwin, and MetLife consultants all documented a key problem that consistently plagued Plaintiff: strong medications reduced her severe pain and inflammation, but caused cognitive symptoms, while a decrease in the medications improved her cognitive function, but left her with intolerable pain. *See e.g*. AR 837 (Dr. Supplitt), AR 833 (Dr. Karplus), AR1006 (Dr. Armstrong-Murphy), AR 864 (Dr. Goodwin).

### B. The magistrate judge did not apply an "improvement" standard.

In *Saffon v. Wells Fargo & Co. Long-Term Disability Plan*, 522 F.3d 863, 870 (9th Cir. 2008)*,* the Ninth Circuit observed that where MetLife "had been paying… benefits for a year, which suggests that [plaintiff] was already disabled," "[i]n order to find her no longer disabled, one would expect" recent MRI scans "to show an *improvement,* not a lack of degeneration." *Id.* at 871 (emphasis in original). Judge Kasubhai noted this holding and explained the parties' positions in the instant case:

> Metlife notes that the issue here is Plaintiff's eligibility for LTD benefits...under the "any occupation" definition of disability. Def.'s Resp. and Mot. for J. 4 (ECF Nos. 23-24). While **Plaintiff** does not respond to Metlife's argument that distinguishes *Saffon*, she **agrees that the issue before the Court is whether Plaintiff met her burden of proof by a preponderance of the evidence that she was disabled under the plan's "any occupation" standard**. Pl.'s Mot. 3 (ECF No. 20); Pl.'s Resp. and Reply (ECF Nos. 27-28).

Findings & Recommendation (Doc. # 36), p. 8 (emphasis added). Judge Kasubhai determined based upon the parties' arguments: "**The Court therefore examines the record *de novo* to determine whether Plaintiff has proved that she was "more likely than not" disabled under the "any occupation" standard of the plan as of March 2017."** *Id*. (emphasis added). He then

engaged in precisely the analysis he forecast, analyzing Plaintiff's medical record from 2014 through MetLife's claim termination in 2017, as well as MetLife's consultants' reviews and conclusions. *Id*., pp. 9-23.

The record not only shows that Plaintiff did not improve in late 2016 and 2017, but that she continued to decline. *See* Pl. Mot., pp. 16-23; Pl. Response & Reply, pp. 23-24. In October 2016, Dr. Karplus documented "***increased*** fatigue," requiring "more naps through the day." AR 802 (emphasis added). In January 2017, Plaintiff reported to Dr. Supplitt pervasive, ***increasing*** pain in her left shoulder, right knee and right shoulder, and right hand cramping. AR 811 (emphasis added). She also had "***more*** intestinal problems." *Id.,* AR 816 (emphasis added). In April 2017, Dr. Karplus noted overall "**worsening**" (AR 833, emphasis added), especially while decreasing methotrexate. *Id.,* AR 827. In May 2017, Plaintiff reported to Dr. Supplitt "white hot pain shooting across the top of her back" and "an overwhelming diffuse achiness" while off Lyrica. AR 837. Dr. Supplitt explained to MetLife in June 2017 that Plaintiff was unable to "sustain even 2 hours office work a day." AR 848.

Judge Kasubhai accurately concluded based upon his review of the record as a whole:

1. While ERISA does not require the court to give special weight to the opinions of treating physicians, Plaintiff's treating physicians' opinions and observations should be given greater weight than the opinions of MetLife's consultants based upon their clinical, in-person observations over time, the consistency of their observations with the record as a whole, and other indicia of accuracy.

2. MetLife's consultants made erroneous statements, unreasonably ignored and dismissed evidence, and imposed erroneous standards upon Plaintiff's claim, reaching erroneous conclusions.

F&R, pp. 19-23.   Contrary to MetLife's assertions, Judge Kasubhai **observed** that while one would expect improvement where MetLife had terminated benefits, he did not **impose** an "improvement" standard.

**C. Judge Kasubhai correctly recommended that Plaintiff's medical record, including the conclusions of her treating and examining providers, be credited over the assertions of MetLife consultants, who omitted facts, misstated the record and asserted improper standards.**

Plaintiff showed that the opinions of various MetLife file review consultants were erroneous and the Court agreed.  Judge Kasubhai addressed the progression of Plaintiff's chronic diseases and symptoms and showed why the opinions of her treating physicians are valid, while opinions of MetLife's consultants are not.

Plaintiff had been disabled from <u>all occupations</u> since March 2014.  Judge Kasubhai observed:  "Although Plaintiff was only required to prove that she was disabled under the 'own occupation' standard to be eligible for benefits for the initial 24 months, Dr. Supplitt and Dr. Schmidt both opined that she was disabled under the 'any occupation; standard." *Id.*, p. 14.  He explained:

> Dr. Supplitt, basing his opinion on years of his personal examination and observation of Plaintiff, opined that Plaintiff could not sustain continuous sitting for more than one or two hours, and that both her physical and cognitive functional limitations render her unable to sustain full-time or part-time work of any kind.

*Id.* (citing AR 308-09, 38, 1262).  Judge Kasubhai noted that the September 2015 "CPET result supported Dr. Supplitt's assessment that Plaintiff could not safely sustain even a sedentary job" and that "Dr. Supplitt's assessment and the CPET results were consistent with Plaintiff's self-reported symptoms.  *Id.* (citing AR 1257, 1262).  He addressed the progression of Plaintiff's

diseases and symptoms through the close of the record and explained why he credited the conclusions of her treating physicians that she had proved her <u>continuing</u> disability from all occupations as of March 2017. *See Id.*, pp. 15-23.

The Court explained why Dr. Armstrong-Murphy's conclusions were erroneous:

1. She implausibly asserted that Plaintiff was "capable of working her job which is sedentary in nature," even though she "listed <u>impairments</u> consistent with Plaintiff's prior diagnoses." *Id.*, p. 15 (emphasis added).

2. She admitted Plaintiff suffered cognitive problems, but dismissed them. She also noted that "'it is difficult to return [Plaintiff] to full-time capacity' given that she is on mood-altering medications and that 'in theory it is reasonable to assume that [Plaintiff] is having cognitive deficits from th[e] medication[s]'" (*Id.* at 15, citing/quoting AR 1005, 1006). She also pointed out, "If the medications are discontinued, [Plaintiff] would have improved cognition but worsened symptoms and fatigability which would make it difficult for her to work[.]" *Id.* (citing AR 1006).

3. Despite these admissions, Dr. Armstrong-Murphy erroneously "restated her conclusion that 'there are limited objective data to warrant any restrictions from her working at a full-time, sedentary job.'" *Id.* (citing AR 1006). She improperly imposed an objective standard upon Plaintiff's claim whereas the policy does not require that disability be proved through objective evidence. *Id.*, p. 15 (quoting AR 1006). *See also Id.*, p. 21 (citing AR 1006).

4. Dr. Armstrong-Murphy "ignored the CPET results without any explanation, even though the test is endorsed by the medical community to be 'the gold standard' and 'the most accurate measurement of functional capacity.'" *Id.* (quoting AR 1253).

The Court explained why MetLife's Dr. Marwah's conclusions were erroneous:

1. Like Dr. Armstrong-Murphy, his "calling for objective evidence for fibromyalgia and the cognitive conditions is not supported by the law and is disingenuous." *Id.*, p. 21 (citation omitted).

2. While Dr. Marwah's assertion that "keeping a fibromyalgia patient as active as possible may be the **standard of care**, it is not equivalent to performing a full-time regular job." *Id.* (emphasis added).

> 3. Like Dr. Armstrong-Murphy, Dr. Marwah unreasonably rejected the CPET results. Contrary to his assertion, the results were consistent with Plaintiff's fluctuating limitations within a day and across days. *Id*., pp. 18, 21-22.

The Court explained that Dr. Kadushin's and Dr. Becker's claims that "that there is no evidence supporting functional limitations due to Plaintiff's psychiatric or psychological disorder" (AR 2948-49, 697) were erroneous. The Court noted Dr. Kadushin even conceded "that it is difficult to completely separate the cognitive and psychological limitations from Plaintiff's physical symptoms" (AR 2948). *Id*., p. 22. The Court also noted that MetLife's Dr. Armstrong-Murphy observed that "Plaintiff's cognition would improve if the medications are discontinued but she would suffer from worsened symptoms and fatigability which would make it difficult for her to work." *Id.* (citing AR 1006).

Judge Kasubhai accurately concluded that Plaintiff's "any occupation" disability is established by her medical record:

> Here, by the time of the appeal, Dr. Supplitt had provided care and examined Plaintiff for approximately seventeen years and Dr. Karplus had examined Plaintiff multiple times over four years. In contrast, Dr. Armstrong-Murphy personally examined Plaintiff once. Dr. Marwah, Dr. Kadushin, and Dr. Becker each only conducted a paper review. None of the consultants could have observed how the fluctuating degree of pain affects Plaintiff's ability to function, thus could not have appropriately assessed the credibility of her reports of pain. *Rabbat* [*v. Standard Ins. Co.,* 894 F. Supp. 2d 1311, 1323 (D. Or. 2012)] ("none of The Standard's three consulting physicians personally examined Mr. Rabbat and none could observe either the effects of his [Familial Mediterreanean Fever] on his ability to function or assess the credibility of his reports of pain").

*Id*., p. 20. He explained that contrary to MetLife's arguments,

> Dr. Supplitt observed and concluded that "[t]he degree of pain fluctuates both within a single day and across days" and Plaintiff "requires frequent rest including the need to lie down[] for 30 minutes to two hours once or more times a day." AR 1262. Based on this observation, Dr. Supplitt opined that Plaintiff is unable to

> perform a sedentary job on a daily basis. Again, Dr. Supplitt's opinion is supported by the CPET results which are also consistent with Plaintiff's reports. Furthermore, Dr. Supplitt's and Dr. Karplus' treatment notes reflect that Plaintiff's condition did not improve from when she was disabled under the "any occupation" standard as of March 10, 2014.

*Id.*, p. 22.  Judge Kasubhai concluded that, in contrast to MetLife's consultants, Dr. Supplitt and Dr. Pugh had taken into account that Plaintiff's ability to function is impacted by a constellation of mental health, cognitive and physical symptoms.  *Id*. (citing AR 256, 1262).  He explained:

> Given Plaintiff's complex medical conditions – involving both physical impairments such as fibromyalgia that cannot be measured by objective evidence, and cognitive and psychological difficulties – the Court should find that Dr. Supplitt's treating relationship with Plaintiff allowed him to personally observe the effects of Plaintiff's multiple impairments and assess the credibility of her reports of pain. For the additional reasons discussed above, the Court should further find that Dr. Supplitt's medical opinions are more reliable and probative of Plaintiff's condition than the reviewing consultants' reports.

*Id.*, p. 23.

Contrary to MetLife's assertion, Judge Kasubhai recommended this Court conclude Plaintiff satisfied her burden of proof based upon her longitudinal medical record, including the consistent observations and conclusions of her treating providers.  He rejected the contrary opinions of MetLife's consultants because they were erroneous.

**D. The magistrate judge did not err in recommending that this Court clarify Plaintiff's right to future benefits.**

Judge Kasubhai did not err in recommending that this Court:

> direct Metlife to pay [Plaintiff's] LTD claim to the policy's maximum benefit duration absent a showing of improvement in her medical condition such that a reasonable physician would conclude that she could "engage with reasonable continuity in any occupation in which [she] could reasonably be expected to perform satisfactorily in light of [her] age[,] education[,] training[,] experience[,] station in life[,] and physical and mental capacity that exists within any of [the] locations [listed.]."

**PLAINTIFF'S RESPONSE TO DEFENDANT'S OBJECTIONS TO FINDINGS AND RECOMMENDATION - Page 13 of 15**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

*Id.*, p. 24 (quoting AR 599 (policy)).

ERISA § 502 (a)(1)(B), § 29 U.S.C. § 1132 (a)(1)(B), authorizes the Court to "clarify [Plaintiff's] rights to future benefits under the terms of the plan." Judge Kasubhai's recommendation is consistent with the policy and statute. It does not impose additional extracontractual terms or contingencies.

His recommended order accurately reflects that based upon this record, there would have to be "[dramatic] improvement in [Plaintiff's] medical condition" for MetLife to terminate Plaintiff's claim. His recommended order accurately reflects that MetLife cannot not legally terminate Plaintiff's claim unless by reasonable medical evidence she no longer meet the policy's disability provision. *Id.*, p. 24 (citing *Gorena v. Aetna Life Ins. Co.*, No. C17-532 MJP, 2018 WL 3008873, at *7 (W.D. Wash. June 15, 2018)).

In *Coleman-Fire v. Standard Ins. Co.*, No. 3:18-cv-00180-SB, 2019 U.S. Dist. LEXIS 76726 (D. Or. May 7, 2019), Judge Beckerman recently concluded:

> Contrary to Defendant's argument, Plaintiff has presented credible evidence indicating that it is 'likely' that Plaintiff's debilitating TBI/PCS symptoms are "permanent" and would prevent her from working more than forty hours a week in her Own Occupation… Accordingly, and in accordance with § 1132(a)(1)(B), the Court offers the following clarification regarding Plaintiff's right to future benefits: **Subject to the terms and conditions of the Plan, Defendant shall pay Plaintiff's LTD claim to the Plan's maximum benefit duration absent a showing of improvement in her TBI/PCS symptoms such that a reasonable physician would conclude that Plaintiff could work more than forty hours per week in her Own Occupation**.

*Id.* at *542-43 (emphasis added). Plaintiff respectfully requests that this Court, too, preface the declaration with the phrase *"subject to the terms and conditions of the Plan,"* to make explicit the implicit point that all of the plan's terms will continue to bind both parties.

Alternatively, or in conjunction with the order recommended by Judge Kasubhai, this Court may also issue the sort of warning meated out in *Delaney v. Prudential Ins. Co. of Am.*, 68 F. Supp. 3d 1214, 1233 (D. Or. 2014).  In *Delaney*, Judge Stewart denied the plaintiff's request for "injunctive relief in the form of an order restricting [the insurer's] future claims processing activities," but observed that given, *inter alia*, the Court's discussion of the insurer's "many failures or missteps" and the decision, it was "highly unlikely" the insurer "will take any adverse action against her without carefully considering the cost of defending a legal challenge."

### III.    CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court adopt the magistrate judge's Findings & Recommendation.

Dated:  October 2, 2019.

>Respectfully Submitted,
>
>s/ Megan E. Glor
>Megan E. Glor, OSB No. 930178